JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

AIR LEASE CORPORATION; ALC B378 41345, LLC; AND ALC B378 37772, LLC,

     Plaintiffs/Counter-Defendants,

     v.

FAR EASTERN AIR TRANSPORT CORP.,

     Defendant/Counter-Plaintiff.

Case No. CV 16-5601- MWF (JEMx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

    This matter came on for trial before the Court sitting without a jury on September 25, 2018. The following witnesses were called and examined by the parties in the order recited below:

    On September 25, 2018, Anthony Battista appeared on behalf of Plaintiffs and Counter-Defendants Air Lease Corporation, ALC B378 41345, LLC, and ALC B378 37772, LLC (collectively "Air Lease" or ALC") and gave an opening statement. Brian Sun appeared on behalf of Defendant and Counter-Claimant Far Eastern Air Transport Corporation ("Far Eastern") and gave an opening statement.

On the same day, following opening statements, Mr. Battista examined **Jie Chen**, executive vice president and managing director of Asia for ALC. Mr. Sun cross-examined Mr. Chen.

On September 26, 2018, Mr. Battista examined **Pierce Chang**, formerly the senior vice president of technical asset management at ALC. Mr. Sun cross-examined Mr. Chang; Mr. Battista conducted a redirect examination; and Mr. Sun conducted a recross examination.

Next, Ms. Diana Gurfel, appearing on behalf of ALC, examined **William T. MacCary**, senior vice president and corporate counsel at ALC. Steven J. Corr, appearing on behalf of Far Eastern, cross-examined Mr. MacCary.

Next, between September 26 and September 27, 2018, Mr. Battista examined **Frank Buratti**, director of technical asset management at ALC. Mr. Corr cross-examined Mr. Buratti; Mr. Battista conducted a redirect examination; and Mr. Corr conducted a recross examination.

On September 27, 2018, Evan M. Kwarta, appearing on behalf of ALC, examined **Carol Giles**, an employee at the Giles Group, an aviation safety consulting group that performs records audits and training. Mr. Corr cross-examined Ms. Giles and Mr. Kwarta conducted a redirect examination.

Next, Mr. Battista examined **Alex Khatibi**, executive vice president for marketing at ALC. Mr. Sun cross-examined Mr. Khatibi.

On September 28, 2018, Mr. Kwarta examined **Stuart Rubin**, vice president of ICF International, Inc. ("ICF") and an International Society of Transport Aircraft Trading ("ISAT") senior certified appraiser. Mr. Corr cross-examined Mr. Rubin.

Next, Mr. Kwarta examined **Samuel Engel**, senior vice president and global managing director of aviation at ICF. Mr. Sun cross-examined Mr. Engel; Mr. Kwarta conducted a redirect examination; and Mr. Sun conducted a recross examination.

Next, Jason L. Liang, appearing on behalf of Far Eastern, examined **Kung Wei ("Alex") Wang**, deputy manager for the maintenance department at Far Eastern. Mr. Battista cross-examined Mr. Wang and Mr. Liang conducted a redirect examination.

On October 3, 2018, Mr. Battista examined **Steven F. Udvar-Házy**, executive chairman of ALC. Mr. Sun cross-examined Mr. Hazy; Mr. Battista conducted a redirect examination; and Mr. Sun conducted a recross examination.

Next, Mr. Battista examined **Kishore Korde**, executive vice president at ALC. Mr. Corr cross-examined Mr. Korde.

Next, Mr. Corr examined **Quentin Brasie**, Far Eastern's aircraft storage expert. Mr. Battista cross-examined Mr. Brasie and Mr. Corr conducted a redirect examination.

On October 4, 2018, Mr. Liang examined **Ching-Wen Cheng**, Chief Financial Officer of the Hua-Fu Group. Mr. Kwarta cross-examined Ms. Cheng; Mr. Liang conducted a redirect examination; and Mr. Kwarta conducted a recross examination.

Next, Mr. Liang examined **Chin Chih ("CC") Tseng**, Chief Operating Officer of Far Eastern. Mr. Battista cross-examined Mr. Tseng and Mr. Liang conducted a redirect examination.

On October 12, 2018, Mr. Corr examined **Chase Perry**, Far Eastern's damages expert. Mr. Kwarta cross-examined Mr. Perry; Mr. Corr conducted a redirect examination; and Mr. Kwarta conducted a recross examination.

Next, Alexandra N. Fries, appearing on behalf of Far Eastern, examined **Cynthillia Kuo**, senior manager of the accounting department at ALC. Mr. Battista cross-examined Ms. Kuo; Ms. Fries conducted a redirect examination; and Mr. Battista conducted a recross examination.

Next, Mr. Liang examined **Czar Vigil**, senior vice president and corporate counsel at ALC. Mr. Battista cross-examined Mr. Vigil and Mr. Liang conducted a redirect examination.

Next, Mr. Corr examined **Bret Weinberg**, director of aircraft specification and procurement at ALC.  Mr. Battista cross-examined Mr. Weinberg and Mr. Corr conducted a redirect examination.

The Court also reviewed the designations and counter-designations of the deposition transcripts of **Szu Hsuan Lin**, a deputy project manager in the planning division at Far Eastern, dated November 28, 2017, together with exhibits thereto; Alex Wang, dated October 27, 2017, together with exhibits thereto; and CC Tseng, dated October 25, 2017, October 26, 2017, and February 27, 2018, together with exhibits thereto.

During and after testimony, exhibits were marked and received into evidence.  (*See* Corrected List of Admitted Trial Exhibits (Docket No. 322-2)).  Following the presentation of evidence and the parties' closing arguments, the matter was taken under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I.      FINDINGS OF FACT

### A.    The Parties

1.      Plaintiff and Counter-Defendant Air Lease Corporation is a Delaware corporation with its principal place of business in California.  Plaintiffs and Counter-Defendants ALC B378 41345, LLC and ALC B378 37772, LLC are Delaware limited liability corporations that have their principal places of business in Delaware.  Air Lease Corporation is the sole member, servicer, and manager of ALC B378 41345, LLC and ALC B378 37772, LLC.  ALC leases and sells commercial aircraft to air carriers around the world.

2.    Defendant and Counter-Claimant Far Eastern Air Transport Corporation is a Taiwanese commercial air carrier with its principal place of business in Taiwan.

**B.    Far Eastern's Bankruptcy and Subsequent Development Plan**

3.    Far Eastern received court approval for bankruptcy protection in the Republic of China (Taiwan) in May 2008.  During the restructuring period, Far Eastern's MD-80 aircraft were in storage and Far Eastern did not operate commercial flights.

4.    The Hua-Fu Group became the majority shareholder of Far Eastern in 2008.

5.    Far Eastern resumed operations in April 2011 and Far Eastern's existing fleet was returned to service.

6.    The Taipei District Court approved Far Eastern's completion of its bankruptcy reorganization in October 2015.

7.    In 2014, Far Eastern prepared a Five Year Fleet Development Plan for submission to the Taiwanese Civil Aviation Authority ("CAA").

8.    Far Eastern was interested in renewing its fleet to fly to farther destinations, as the MD-80 aircrafts in their fleet could not fly long distances.

9.    Far Eastern considered the purchase or lease of Boeing, Airbus, Bombardier, and Embraer aircraft before focusing on the purchase or lease of B738s.  In the case of Boeing, Far Eastern considered the potential purchase or lease of B738s and 737-900 aircraft.

10.    Far Eastern contacted potential lessors in 2014.  As of March 2015, Far Eastern received proposals from several lessors for the lease of B738 aircraft.  In February 2015, Far Eastern sought and received permission from the CAA to lease two B738 aircraft.

**C.    The MSN 41345 Lease**

11.    In February 2015, Far Eastern contacted ALC to inquire about the availability of B738 aircraft for delivery in 2016.

12.    In April 2015, Far Eastern also pursued six other B738 aircraft from UTAir that it knew were stored.  (*See* Ex. 1207).

13.     Szu Hsuan Lin testified that in considering whether a particular airplane manufacturer or leasing company has suitable aircraft for operation by Far Eastern, Far Eastern considers, among other factors, the aircraft's age, the leasing period, and the rent.

14.     On June 1, 2015, ALC provided Far Eastern with a term sheet for one new B738 aircraft, Manufacturer Serial Number 41345 ("MSN 41345"), which was executed on June 3, 2015.

15.     After ALC sent a draft of the lease agreement for MSN 41345 on June 12, 2015, Far Eastern's legal team reviewed the draft clause-by-clause, and the parties exchanged comments and drafts.

16.     ALC and Far Eastern held lease negotiation meetings in Taipei regarding MSN 41345 on July 6, 2015.  The lease agreement for MSN 41345 (the "MSN 41345 Lease") was executed on July 13, 2015.  (*See* Ex. 78).

17.     On June 12, 2015, Far Eastern applied to the CAA for permission to operate two B738 aircraft, which the CAA granted on July 13, 2015.

**D.     Lease Negotiations Regarding MSN 37772**

18.     On June 7, 2015, Far Eastern notified ALC that it was interested in leasing a second B738.  On June 11, 2015, ALC offered Far Eastern a second B738 aircraft for delivery in 2016, but the offer expired before meaningful discussions took place.

19.     Far Eastern expressed interest in delivery in the May to June 2016 timeframe so that Far Eastern could utilize the aircraft for the summer peak season.

20.     In August 2015, ALC offered Far Eastern a young 737-800 aircraft, Manufacturer Serial Number 37772 ("MSN 37772").  ALC informed Far Eastern that MSN 37772 was on lease to Air Berlin with Air Berlin's lease return set for November 2020, but that Air Berlin was interested in terminating the lease early to switch to Airbus aircraft.

21.     On August 27, 2015, ALC sent a proposed letter of intent ("LOI") for MSN 37772.  (*See* Ex. 216).  A revised LOI was sent on September 16, 2015.  (*See* Ex. 1217).  The revised LOI specified a lease execution date of October 15, 2015.  (*See* Joint

Stipulation of Facts (Docket No. 257-2)).  The LOI contained the majority of the commercial terms, such as the lease rate, reserves, and deposits, as well as information regarding the technical conditions of the aircraft.  The LOI also specified the delivery condition of MSN 37772 was "AS IS WHERE IS."  Far Eastern sought clarification regarding the "AS IS WHERE IS" clause.  ALC responded, and also explained that prior to delivery, MSN 37772 would undergo a C-Check.  A C-Check is a "heavy check" during which an aircraft is stripped down and systems and structures are examined and inspected to, among other things, ensure the airworthiness of the aircraft.

22.    Jie Chen, the ALC marketing executive directly responsible for the marketing and negotiation of the Far Eastern leases, testified that, during negotiations of the LOI, Far Eastern may have asked whether the airplane was flying, to which Mr. Chen responded in the affirmative.

23.    Far Eastern signed the revised LOI on September 19, 2015.

24.    Alex Wang, deputy manager for the maintenance department at Far Eastern, testified that during his August and September 2015 meetings with Mr. Chen and Pierce Chang of ALC, he did not ask about the operational status of MSN 37772 specifically, but that he did ask Mr. Chang whether Air Berlin was using MSN 37772, and that based on Mr. Chang's response, he concluded that the aircraft was in operation.

25.    After the LOI was executed, Mr. Chen gave the LOI to Toby MacCary so that he could prepare a draft lease agreement based on the terms and conditions outlined in the LOI.  On September 29, 2015, ALC sent a draft lease for MSN 37772 to Far Eastern. During negotiations of the lease agreement, Amanda Lin from Far Eastern prepared an "open issues list," which was a complete chart representing all of the issues raised by either side during the negotiation of the lease agreement.  On October 9, 2015, Far Eastern provided its comments to the MSN 37772 lease.  During this time, Far Eastern never asked whether MSN 37772 was flying, or how Air Berlin was operating the Aircraft.

26.    The parties did not execute the lease by October 15, as contemplated by the LOI.

27.     On November 7, 2015, Air Berlin put MSN 37772 into storage. Air Berlin did not notify ALC that MSN 37772 was inducted into storage. The lease agreement for MSN 37772 did not require Air Berlin to notify ALC that the aircraft was being placed in storage.

28.     Mr. Hazy, ALC's CEO, testified that ALC mandates in its lease agreements that the airline is responsible for maintenance and upkeep of the aircraft in compliance with the regulations of the country in which the airline operates.

29.     The fact that MSN 37772 was being stored by Air Berlin was publicly available on aviation websites. However, at no point before the parties signed the MSN 37772 lease agreement did ALC tell Far Eastern that the aircraft was in storage.

30.     On November 19, 2015, ALC sent Far Eastern a revised version of the MSN 37772 lease and a side letter, including a "redline" comparing the updated iteration of the MSN 37772 lease to the prior version. (*See* Joint Stipulation of Facts).

31.     On November 20, 2015, Far Eastern paid the first security deposit in the amount of $317,000 pursuant to the MSN 37772 LOI.

32.     On December 3, 2015, Air Berlin sent ALC a utilization report for MSN 37772, which indicated that the aircraft flew 34 hours in November, down from 226 hours in October. (*See* Ex. 119). A utilization report is a document submitted by ALC's air carrier lessees that reports the usage of the aircraft, including flight hours and the number of cycles flown, for a particular period of time, typically one calendar month. These reports are sent to ALC's utilization report email address on a monthly basis, which includes various departments of ALC.

33.     Mr. Chen travelled to Taipei in early December 2015 to assist in finalizing the lease agreement for MSN 37772. During these negotiations, the parties never discussed the flying status of the aircraft. Mr. Chen testified that, over the span of his nearly 30-year career negotiating hundreds of lease agreements, no airline has ever raised the issue of aircraft storage.

34. The meeting did not result in final execution of the lease agreement since there were a few outstanding issues that needed to be further negotiated. After returning to Los Angeles, Mr. Chen emailed CC Tseng, Far Eastern's COO, and urged him to execute the lease agreement so that ALC could begin modification of MSN 37772 as soon as possible to suit Far Eastern's specifications – such as creating a first-class cabin – so that delivery could be made by June 2016. The lease agreement for MSN 37772 was executed on December 11, 2015 (the "MSN 37772 Lease"). (*See* Ex. 9).

35. During the lease negotiations for MSN 37772, the operational status of the aircraft was never mentioned by either party.

36. On January 7, 2016, Far Eastern submitted a lease and purchase plan for its use of MSNs 37772 and 41345 to the CAA.

37. In the first quarter of 2016, in preparation for the introduction of two new aircraft to its fleet, Far Eastern hired 20 new pilots and 34 engineers and sent them to Seattle, Washington for training.

**E.    Early Termination of Air Berlin's Lease Agreement**

38. During the negotiations for Air Berlin's early termination of the lease agreement for MSN 37772, ALC and Air Berlin did not discuss whether the aircraft was being stored or would be stored.

39. The lease termination agreement was signed on December 22, 2015. (*See* Ex. 3). The effective date of the lease termination was anticipated to be July 1, 2016.

40. Mr. Khatibi testified that it was his understanding that MSN 37772 was operational when the lease termination agreement was signed. Mr. Khatibi testified that he did not know that MSN 37772 was in storage until Mr. Chen asked him in May 2016 for confirmation from Air Berlin that MSN 37772 was indeed parked.

41. Mr. Khatibi testified that he has negotiated hundreds of leases in his career, and that storage has never been raised in these negotiations.

42.     Mr. Khatibi also testified that leasing companies do not keep track of the day-to-day operations and treatment of the assets they lease, so there would be no reason to check storage specifically.

43.     Pursuant to the lease termination agreement between ALC and Air Berlin, Air Berlin paid a $1 million fee for early termination.  Mr. Khatibi testified that this termination fee acts primarily as a penalty for lost business but is also designed to pick up some of the cost to transfer the aircraft to the new lessee.  A number of different variables affect the total of a given early termination fee, including the relationship with the terminating lessee, the prospect of continued business with the terminating lessee, and how many other aircraft may be involved in the termination process.

### F.     MSN 37772 Lease Agreement

44.     The lease agreement between ALC and Far Eastern had a provision that required Far Eastern to notify ALC if it put the aircraft in storage.  Section 15.3 of the lease agreement states in full: "If the Aircraft, any Engine or any Part is out of revenue service (except for the performance of maintenance, repair or Overhaul procedures), Lessee shall promptly notify Lessor thereof and the Aircraft, such Engine or such Part shall be properly and safely stored, maintained, and insured in accordance with accepted industry and manufacturer specifications and procedures."

45.     ALC began using a new form lease agreement in June 2015.  The lease agreement between ALC and Air Berlin for MSN 37772, which was executed in August 2011, did not include a storage provision similar to Section 15.3 of the lease agreement for MSN 37772 between ALC and Far Eastern.  (*See* Ex. 325).

### G.     Communications Regarding Status of MSN 37772

46.     The MSN 37772 Lease required Far Eastern to develop a maintenance program for the aircraft, and to obtain approval from the CAA.  In order to develop a bridging maintenance plan for MSN 37772, Far Eastern required various documents, including the Boeing Maintenance Planning Document ("MPD") and other documents reflecting Air Berlin's maintenance programs and inspections.

47. To that end, Far Eastern requested various documents from ALC. In response, in October 2015, Frank Burrati, the ALC executive responsible for arranging the delivery of MSN 37772 to Far Eastern, sent Far Eastern a variety of MSN 37772's maintenance documents, including the Task Card Last Compliance Print ("TCLCP" or "Last Done Next Due" or "LDND"), which is a record of all the maintenance tasks performed on an aircraft and a statement of when the maintenance task is next scheduled to be performed. (*See* Ex. 4). However, despite Far Eastern's requesting it, ALC did not send a copy of Air Berlin's maintenance program, explaining that it was proprietary and Far Eastern would instead have a chance to review it on-site during a pre-delivery records inspection.

48. Pursuant to Far Eastern's request, on January 22, 2016, Mr. Buratti sent an updated LDND to Mr. Wang. (*See* Ex. 5). In order to get the latest LDND, Mr. Buratti had to ask Air Berlin for a copy. Mr. Buratti did not review the document before he sent it to Mr. Wang.

49. The first line of the first page of the updated LDND stated "STORAGE FOR MORE THAN 7 DAYS (B737NG)." The second line stated, "STORAGE FOR MORE THAN 30 DAYS (B737NG)." Both lines indicated that storage of the aircraft began on November 7, 2015. The updated LDND was circulated to at least 29 employees at Far Eastern, many of whom were in the Maintenance and Engineering Division. None of the people in the email chain raised a concern about the length of storage of MSN 37772 despite the first four entries on the LDND being related to storage tasks.

50. On May 16, 2016, Mr. Wang requested an updated LDND for MSN 37772. (*See* Ex. 12). In response to Mr. Wang's request, on the following day, Mr. Buratti mistakenly sent Mr. Wang the LDND he had previously sent in January 2016. To make sure there was not a more recent LDND available, Mr. Burrati checked the aircraft's utilization report for January 2016 and noticed that the aircraft reported no flight hours that month. Mr. Burrati then checked the aircraft's utilization reports for February through May 2016 and observed that these reports also indicated zero utilization. Mr.

Burrati noted that because MSN 37772 had not flown since the last updated LDND, nothing on the LDND had changed.

51. On May 17, 2016, Mr. Buratti received an email from Mr. Wang asking whether MSN 37772 was parked in a hangar or outside, if there were any issues with the paint, and for the storage task records. (*See* Ex. 262). Mr. Buratti also received an email from Glen Lee at Far Eastern on May 18, 2016, telling him that Far Eastern "will work with [ALC] for aircraft delivery issue."

52. Mr. Buratti testified that his practice when receiving utilization reports from airlines every month is to save them to a folder on his computer, but he does not open the reports unless he needs to obtain specific information from them.

53. Low utilization of an aircraft is common and may stem from a number of reasons, including scheduled maintenance, seasonal demand, and bad weather.

## H. Rescission of MSN 37772 Lease

54. On May 23 and May 24, 2016, Far Eastern sent letters to ALC indicating that it first learned of the storage of MSN 37772 in May 2016, and on that basis, it was rescinding the lease agreement. At that point, Far Eastern had never inspected MSN 37772 or its storage records, or asked if the storage would impact the agreed-upon delivery date. Far Eastern never paid the second and third deposits for MSN 37772. Far Eastern had not yet signed an Acceptance Certificate for MSN 37772.

55. On May 27, 2016, ALC sent Far Eastern a letter stating that under the MSN 37772 Lease, Far Eastern had no right to rescind. ALC also sent Far Eastern a "Parking Notification Statement" from Air Berlin, which stated that MSN 37772 had been parked since November 7, 2015; Air Berlin had no obligation to notify ALC of the storage and had not notified Air Berlin of the storage; and that during the storage, MSN 37772 had been maintained in accordance with applicable regulations. Air Berlin had provided this statement to ALC at ALC's request, so that ALC could provide it to Far Eastern. (*See* Exs. 38-39).

56.     After Far Eastern rescinded the MSN 37772 Lease, Mr. Chen and Mr. Burrati flew out to Taipei to meet with Mr. Tseng in person to discuss the issues.  The meeting occurred on May 27, 2016.  The transcript of this meeting, surreptitiously recorded by Mr. Chen with Mr. Burrati's knowledge, is Exhibit 1073.

57.     On June 9, 2016, Mr. Hazy emailed Mr. Tseng with the following offer: (1) ALC would agree to postpone delivery of MSN 41345 to June 23, 2016; (2) the parties would mutually terminate the MSN 37772 Lease and ALC would apply Far Eastern's $317,000 security deposit from the MSN 37772 Lease to the security deposit Far Eastern owed on the MSN 41345 Lease, and (3) the parties would release each other from any claims or liability in connection with the MSN 37772 Lease.

58.     On June 13 and June 15, 2016, Mr. Hazy wrote to Far Eastern, following up on the offer set forth above.  He indicated that Far Eastern had no legal right to rescind or terminate the MSN 37772 Lease, but that due to the parties' relationship, ALC would "respect" Far Eastern's decision not to take MSN 37772.  Mr. Hazy also indicated that ALC could enforce the agreement in court, but that was not how he conducted business with "good airlines" and that instead he would "take the high road" to allow Far Eastern to take only the MSN 41345 Lease, if Far Eastern complied with the lease agreement in all respects.

**I.      Attempted Delivery of MSN 41345**

59.     As required by the MSN 41345 Lease, ALC customized MSN 41345 to Far Eastern's specifications.  Far Eastern executed the Acceptance Certificate, pursuant to Section 2.6 of the lease agreement.

60.     ALC's expectation was that Far Eastern would execute the lease termination agreement for the MSN 37772 Lease, and so, on June 14, 2016, ALC sent Far Eastern an invoice that applied the $317,000 from the MSN 37772 security deposit to the outstanding amount due on the security deposit for MSN 41345.  With the application of the $317,000 from the MSN 37772 security deposit, the amount due on the security deposit for the

MSN 41345 was $83,000.  ALC paid the $83,000 due under the invoice dated June 14, 2016.

61.     On June 21, 2016, ALC's General Counsel reiterated to Far Eastern that in order to complete the leasing of MSN 41345, ALC needed full payment of the outstanding $317,000 balance of the security deposit for MSN 41345, and that the $317,000 security deposit made for MSN 37772 would be credited to MSN 41345 once Far Eastern signed a lease termination for the MSN 37772 Lease.

62.     Representatives for ALC and Far Eastern met at Boeing's delivery center in Seattle, Washington, on June 23, 2016, for delivery of MSN 41345.  The night before, ALC had sent Far Eastern a lease termination agreement for the MSN 37772 Lease.  The lease termination agreement included the mutual release that ALC offered to Far Eastern regarding the MSN 37772 Lease.  Again, on June 26, 2016, Mr. Hazy explained to Far Eastern that because, in his view, there was a valid lease agreement for MSN 37772, it could only be terminated by signing a lease termination, and only then could the $317,000 deposit made on the MSN 37772 be applied to the balance owed on the MSN 41345 Lease.  ALC reiterated the importance of the lease termination agreement in several other communications.

63.     However, Far Eastern did not sign the lease termination agreement for the MSN 37772 Lease.  Far Eastern explained that it would proceed with delivery of MSN 41345, but it would not sign a release as to MSN 37772, because Far Eastern had suffered millions of dollars' worth of damages related to the collapse of that lease agreement.

64.     On June 27, 2016, after several days of attempting to finalize delivery of MSN 41345, Far Eastern told ALC that if delivery was not completed that day, Far Eastern would fly back to Taiwan.  That day, ALC agreed to tender delivery of MSN 41345 to Far Eastern by hand-delivering to Far Eastern representatives at Boeing's delivery center a tender of delivery letter.  The letter noted that delivery was "under the assumption and good faith that our two companies will resolve by July 1, 2016, the outstanding issues related to the termination of the lease agreement for MSN 37772, and

the transfer of the security deposit of $317,000 under the MSN 37772 lease to the MSN 41345 lease once that lease is terminated." Far Eastern refused delivery of MSN 41345, and instead flew back to Taiwan.

65. ALC's General Counsel testified in deposition that ALC had decided to apply the $317,000 to the amount due on the MSN 41345 security deposit so that Far Eastern could take the aircraft, and that she understood that the issues involving the MSN 37772 agreement would be resolved at a later date.

**J.    Significance of Storage**

66. Carol Giles testified that air carriers often store aircraft in the course of their regular operations, commonly in response to decreased demand. In its maintenance program, Boeing outlines the procedure for how to properly store an aircraft. Ms. Giles testified that proper storage does not affect airworthiness or maintenance condition of the aircraft, and that in her experience she has not observed any lingering issues with maintenance after an aircraft was placed in a proper storage program.

67. Ms. Giles testified that, in order to determine whether the storage of MSN 37772 affected the aircraft's airworthiness, she looked at its storage records, at the storage program from the aircraft maintenance manual from Boeing, at the aircraft's C-Check records, and for anomalies or other issues. Ms. Giles testified that her review of these records did not reveal any issues arising from the storage of MSN 37772.

68. Ms. Giles testified that even though Air Berlin performed two work orders late and that the records for MSN 37772 were missing an additional two work orders, the aircraft was still airworthy.

69. Of the late orders, one was a work order for a seven-day and 14-day interval check. Ms. Giles testified that "it's not a good thing" to perform an inspection late, but that "[y]ou can actually do the 14-day check and take credit for everything else below that 14-day check." Regarding the second late inspection, Ms. Giles testified that the fact that the check was five days late is "not something you want to see." However, Ms. Giles

testified that these two late checks would not be a reason "to take away the MRO's certificate because they missed—they didn't do two checks on time."

70. Ms. Giles further testified that, with respect to the missing work orders, she could nevertheless discern that the work orders were in fact completed when she reviewed a work order summary that reflects all the work for a period of time that was completed on that aircraft. Ms. Giles testified that, in her experience, regulators can look to other records to recreate the maintenance history of the aircraft if there are missing work orders.

71. MSN 37772 underwent a pre-delivery C-Check on May 27, 2016, which was completed on June 9, 2016.

72. Stuart Rubin testified that, based on his experience, proper aircraft storage does not adversely impact aircraft value. Mr. Rubin testified that the ISTAT handbook and industry bluebooks do not mention the effect of storage on value.

73. Mr. Rubin further testified that, while there may be additional costs of returning an aircraft to operational status after a period of storage, these additional costs do not impact the value of the aircraft.

74. Mr. Rubin testified that his practice as an appraiser is to include information in his appraisal regarding an aircraft's storage if he receives that information from the lessee, but that if he does not receive that information he does not actively seek it out.

75. MSN 37772 had a valid certificate of airworthiness during the entire period of storage.

76. After the C-Check for MSN 37772, the German aviation authority issued an export certificate of airworthiness to India. (*See* Ex. 328). MSN 37772 also received a certificate of airworthiness when delivered to SpiceJet, the subsequent lessee of MSNs 37772 and 41345, by the Indian aviation authority. (*See* Ex. 329).

77. Quentin Brasie testified that long-term storage of aircraft has a material impact on the aircraft's maintenance, airworthiness, safety, and adversely affects the time to return the aircraft to service. Mr. Brasie testified that, even though these risks may be mitigated by a C-Check, latent maintenance risks may develop after a period of storage.

78. Mr. Brasie also testified that the value of a stored aircraft is less than the value of an operational aircraft because of uncertainty regarding the costs or time required to return the aircraft to service.

79. Mr. Brasie testified that, even though storage decreases the value of an aircraft, storage is not factored in industry blue books because those guides are geared towards giving a value based upon the half-time hypothetical aircraft for the year of manufacture.

80. Mr. Brasie also testified that storage is ordinarily verbally discussed at the onset of any negotiation for the sale or lease of an aircraft, but that these discussions do not typically appear in lease agreements.

81. Mr. Braise also testified that Air Berlin missed four storage checks and was late on six other storage checks. Mr. Brasie testified that any break with the maintenance program is material, and therefore Air Berlin's improper storage of MSN 37772 rendered the aircraft unairworthy. Mr. Brasie also testified that even though MSN 37772 had an airworthiness certificate from the German aviation authorities, the airworthiness certificate does not mean that the aircraft is airworthy, but rather that the aircraft meets its type design.

### K. Departmental Interaction at ALC

82. In order to effectuate the negotiation and finalization of a lease agreement, various departments of ALC, including marketing, technical, and finance, must interface and share information.

83. In order to facilitate the negotiation of maintenance reserves, the marketing department must coordinate with the finance department regarding the rates for the reserves. Maintenance reserves are intended to ensure that a lessee pays an amount needed for future maintenance based on its use of the aircraft.

84. After a lease is executed, the accounting department of ALC uses utilization reports to calculate the total amount in maintenance reserves due for a particular airline for a given time period. To facilitate the issuance of maintenance reserve invoices, at the

beginning of the lease term, the accounting department sets up a general calculation sheet for that particular aircraft based on the terms stated in the lease agreement. The calculation sheet allows the accounting department to input utilization numbers each month as reported in the utilization reports to produce maintenance reserve invoices. Specifically, to calculate the maintenance reserve fees owed to ALC, the accounting department multiplies the number of flight hours reported in a utilization report by the maintenance reserve rate as set out in the lease agreement.

85.     Ms. Kuo testified that she knew that MSN 37772 flew only 34 hours in November 2015 and flew no hours in December 2016, as Ms. Kuo needed that information to produce the maintenance reserve invoices to Air Berlin. Ms. Kuo also testified that flight hours on utilization reports normally vary for aircraft from month to month.

### L.     Post-Incident Conduct

86.     After the dissolution of the MSN 37772 and MSN 41345 Leases, Far Eastern contacted several other aircraft lessors or sellers about acquiring other B738 aircraft.

87.     On May 24, 2016, the same day that Far Eastern rescinded the lease agreement for MSN 37772, ALC began re-marketing the aircraft. Mr. Hazy directed his marketing team to begin reaching out to other airlines that operate Boeing 737-800s to remarket the aircraft. His marketing team approached between 12 to 15 airlines in both the northern and southern hemispheres. Kishore Korde at ALC was aware that SpiceJet, an Indian air carrier, was looking for two 737-800s, so he contacted SpiceJet to explore the opportunity of a leasing agreement. Mr. Korde did not try to remarket the aircraft to other airlines. Mr. Korde testified that he negotiated the terms and conditions of MSN 41345 with SpiceJet between June 28 and June 30, 2016.

88.     Within two months, ALC re-leased MSN 37772 and MSN 41345, and delivered both aircraft to SpiceJet for lower rent rates and shorter lease terms. On June 30, 2016, ALC entered into a 76-month lease agreement with SpiceJet for MSN 37772, with a base monthly rent of $290,000. (*See* Ex. 10). The lease agreement with Far

Eastern for MSN 37772 contemplated a 96-month lease with a base monthly rent of $317,000. On July 14, 2016, ALC entered into a 96-month lease agreement with SpiceJet for MSN 41345, with a base monthly rent of $317,500. (*See* Ex. 79). The lease agreement with Far Eastern for MSN 41345 contemplated a 144-month lease with a base monthly rent of $378,000.

89. SpiceJet was able to secure a lower lease rate for MSN 41345 in part because MSN 41345 was already customized to Far Eastern's specifications and SpiceJet was acquiring the aircraft towards the end of the peak summer season in India.

90. Mr. Korde testified that there was a sense of urgency to get both aircraft placed with SpiceJet as soon as possible because the summer season for SpiceJet was closing.

91. During negotiations, ALC disclosed to SpiceJet that MSN 37772 was in storage. Mr. Korde testified that he does not recall SpiceJet raising the issue of the storage of MSN 37772 during the lease negotiation.

92. Mr. Hazy testified that it was easier to lease the two aircraft as a package to SpiceJet, but that if there would have been a better deal to split up the aircraft and lease them separately to two different airlines, ALC would have explored that option. But ultimately, SpiceJet was willing to take both aircraft and to do so expeditiously.

93. Mr. Hazy testified that meeting the 10-Q reporting deadline, in which ALC would have to report any unleased aircraft, did not impact the lease rate to SpiceJet. Mr. Hazy testified that ALC's goal was to place both aircraft as quickly as possible to generate revenue before the end of the peak summer season. Mr. Korde also testified that he does not recall having any discussions with Mr. Hazy regarding closing the deal with SpiceJet before the financial quarter closed.

94. Section 15.3 of the lease agreement between ALC and SpiceJet for MSN 37772 provides in full: "If the Aircraft, any Engine or any Part is out of revenue service (except for the performance of maintenance, repair or Overhaul procedures), Lessee shall promptly notify Lessor thereof and the Aircraft, such Engine or such Part shall be properly

and safely stored, maintained, and insured in accordance with accepted industry and manufacturer specifications and procedures."

95.     SpiceJet has been continuously flying both aircraft since acquiring them without incident.

96.     Under California law, the Court concludes as set forth below that its rulings on materiality in regard to the MSN 37772 Lease are findings of fact. Indeed, that was the basis for the denial of summary judgment. Nonetheless, the Court's specific findings on materiality and reasons therefor are set forth in the Conclusions of Law so that they flow from the discussion of the elements.

97.     Likewise, the Court's determinations as to damages are findings of fact. The damages are based on the evidence. For example, while both experts were qualified and well-prepared, the Court views the testimony of Samuel Engel as more persuasively explaining the appropriate damages, based both on the evidence and California law. The Court's specific findings on damages are set forth in the Conclusions of Law so that they flow from the discussion of California law and lead into the verdict.

98.     I will drop the third person for a moment and mention a "non-finding" of fact. That is the meeting between Messrs. Chen and Buratti with representatives of Far Eastern, including Mr. Tseng, that is referenced above in paragraph 56. Despite the attention the meeting and the recording received at trial, I don't think that evidence helps or hurts either side. Mr. Chen's decision to record the meeting does not tell me anything about ALC's business culture. Perhaps Mr. Chen hoped to salvage the relationship; perhaps he hoped to use the recording to justify himself somehow to Mr. Hazy. It doesn't really matter. I think Mr. Tseng's outrage over the storage was genuine, but neither the storage nor the outrage justified either breach of contract. The outrage was probably rooted in a personal sense of betrayal. It doesn't really matter.

## II.     CONCLUSIONS OF LAW

### A.     ALC's Contract Damages for Breach of MSN 41345 Lease

1.     The Court previously held in its Order dated August 7, 2018 (the "August 7 Order" (Docket No. 196)) that the MSN 41345 Lease was valid and enforceable, that Far Eastern breached the MSN 41345 Lease, and that ALC did not. Far Eastern's affirmative defenses are likewise unavailing as a matter of law.

2.     Accordingly, ALC is entitled to damages arising from Far Eastern's breach of the MSN 41345 Lease.

3.     "When one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that party 'whole,' that is, enough to place the non-breaching party in the same position as if the breach had not occurred," including lost profits. *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1708-09, 51 Cal. Rptr. 2d 365 (1996); *see also Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455, 277 Cal. Rptr. 40 (1990) (finding the basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance); *Vaccarino v. Midland Nat. Life Ins. Co.*, No. 2:11-CV-05858-CAS, 2014 WL 572365, at *8-9 (C.D. Cal. Feb. 3, 2014) (awarding contract expectation damages); *Dairy Farmers of Am., Inc. v. Cacique, Inc.*, No. B219840, 2011 WL 2936463, at *15 (Cal. Ct. App. July 20, 2011) (affirming jury decision to award plaintiff the difference between the price it contracted for with defendant and the price it actually received from the replacement buyer).

4.     Under California law, the prevailing party's damages are discounted if he or she did not mitigate damages. *See Lawrence v. FCA US LLC*, No. CV165452PSGMRWX, 2017 WL 6940513, at *4 (C.D. Cal. Sept. 12, 2017) (holding that plaintiff mitigated her damages) (citing *Valle de Oro Bank v. Gamboa*, 26 Cal. App. 4th 1686, 1691, 32 Cal. Rptr. 2d 329 (1994)); *Agam v. Gavra*, 236 Cal. App. 4th 91, 110, 186 Cal. Rptr. 3d 295 (2015).

5.     Here, ALC's damages are the difference in value between the value in the Far Eastern lease agreement and the SpiceJet lease agreement.  Samuel Engel, ALC's damages expert, testified that that he used a but-for calculation methodology to determine ALC's damages – in other words, he compared the value that ALC would have received under its leases with Far Eastern versus the value that it is receiving and will receive under its leases with SpiceJet.

6.     Chase Perry, Far Eastern's damages expert, testified that Mr. Engel's opinion as to ALC's lost profits is overstated, namely because Mr. Engel did not consider a number of possible alternative scenarios.  For example, Mr. Perry testified that Mr. Engel failed to consider the possibility that ALC rushed to sign the SpiceJet leases and therefore received a below-market deal.  In this example, Mr. Perry suggested that the Court increase the SpiceJet lease rates by at least 10%.  In sum, Mr. Perry testified that Far Eastern's lost profits and other damages, would total $5.6 million: $3.6 million for lost profits and $2 million for other damages.  As to ALC's damages, its damages could be as low as $6 million.

7.     The Court **FINDS** that the testimony of Mr. Engel better explained the proper damages, pursuant both to the evidence and California law, than did the testimony of Mr. Perry.  To the extent that the Court is called upon to make a credibility determination between these two opinion witnesses, the Court chooses Mr. Engel, based on logic, common sense, the experience and expertise of the witnesses, and their performance under cross-examination.

8.     The Far Eastern lease for MSN 41345 created a nominal value to ALC of $84.9 million, which pursuant to Section 20.6 of the lease agreement, is to be discounted to present value at a rate of 4%.  $84.9 million discounted to present value at 4% is $65.1 million.

9.     The SpiceJet lease for MSN 41345 created a nominal value to ALC of $62.7 million, which pursuant to Section 20.6 of the lease agreement, is to be discounted to

present value at a rate of 4%. $62.7 million discounted to present value at 4% is $50.5 million.

10.     Therefore, the difference in value between the Far Eastern and SpiceJet leases for MSN 41345 is $14.6 million, on a discounted basis.

11.     ALC is entitled to the full amount set forth above, as the Court **FINDS and CONCLUDES** that ALC reasonably mitigated its damages.  ALC moved to re-lease MSN 41345 as soon as possible after Far Eastern's breach; ALC sought to re-lease MSN 41345 on the best terms it could obtain; ALC re-leased MSN 41345 in an amount of time that was as good as or better than the industry standard for re-leasing an aircraft; and ALC obtained the best possible lease terms it was able to.  Accordingly, no discount from the $14.6 million is merited.

### B.     ALC's Transition Cost Damages for Breach of MSN 41345 Lease

12.     ALC also is entitled to the cost to re-configure MSN 41345 from Far Eastern's desired specifications to those desired by SpiceJet because the re-configuration was required in order for ALC to re-lease the aircraft.  *See Brandon & Tibbs*, 226 Cal. App. 3d at 461 (citing *Vitagraph, Inc. v. Liberty Theaters Co.*, 197 Cal. 694, 697 (1925); *Rosenberger v. Pac. Coast Ry. Co.*, 111 Cal. 313 (1896) (holding that special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach of contract are recoverable as damages).

13.     These costs total $800,000.  ALC expended $500,000 to re-configure the seats onboard MSN 41345.  The cost to re-paint MSN 41345 was $100,000.  ALC expended an additional $200,000 in amounts necessary to undertake additional re-configurations for SpiceJet, including replacing placard cards, interior upgrades, and purchasing additional parts.  These costs were a condition of re-leasing MSN 41345 to SpiceJet, without which ALC's damages would have been greater.  Accordingly, no discount is merited.

### C.    ALC's Remarketing Damages for Breach of MSN 41345 Lease

14.    ALC also is entitled to the costs it incurred to re-market MSN 41345 to SpiceJet subsequent to Far Eastern's breach.  *See Brandon & Tibbs*, 226 Cal. App. 3d at 461 (citing *Vitagraph, Inc.*, 197 Cal. 694; *Rosenberger*, 111 Cal. 313) (holding that special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach of contract are recoverable as damages).

15.    These costs were incurred in tandem with ALC's efforts to re-market MSN 37772 because they were marketed together.  The total amount of ALC's re-marketing costs for both aircraft was $74,200, at the time each expense was incurred, meaning no discounting is necessary.  Half of those marketing expenses, representing half of the aircraft marketed, is $37,100.  Expending these costs was necessary to obtaining a substitute lessee subsequent to Far Eastern's breach, without which ALC's damages would be greater.  Accordingly, no discount from the $37,100 is merited.

### D.    Pre-Judgment Interest as to MSN 41345 Lease

16.    As outlined above, ALC's total damages arising from Far Eastern's breach of the MSN 41345 Lease are $15,437,100.

17.    Under California law, ALC is entitled to pre-judgment interest on that amount from the date of its Complaint, July 27, 2016, through the date final judgment is rendered, at a rate of 10 percent *per annum*, either simple or compounded at the Court's discretion.  *See California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 34-35, 221 Cal. Rptr. 171 (1985) (affirming jury decision to award pre-judgment interest calculated from the time the indemnity should have been paid up to the date of the judgment.)*;see also SP INVESTMENT FUND I, v. Ivan Grossman*, No. B284289, 2018 WL 4113837, at *4 (Cal. Ct. App. Aug. 29, 2018); *Lehman Bros. Holdings, Inc. v. First Guar. Fin. Corp.*, No. SACV090435AGMLGx, 2011 WL 13225086, at *4 (C.D. Cal. May 23, 2011); *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1587, 36 Cal. Rptr. 2d 343

(1994), *as modified* (Nov. 14, 1994), *as modified on denial of reh'g* (Nov. 17, 1994*), as modified* (Nov. 22, 1994).

18. The Court determines that ALC is entitled to pre-judgment interest at the rate of 10 percent *per annum*, in simple interest. Given the current low interest rates prevailing, compounding the interest would be a windfall to ALC.

### E. Attorneys' Fees as to MSN 41345 Lease

19. Under Section 23.4 of the MSN 41345 Lease, because ALC is the prevailing party in the dispute regarding MSN 41345, it is entitled to reasonable attorneys' fees. *See Exxess Electronixx v. Heger Realty Corp.*, 64 Cal. App. 4th 698, 706, 75 Cal. Rptr. 2d 376 (1998); Cal. Code Civ. Proc. § 1021 ("Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties[.]"). ALC shall be awarded its reasonable attorneys' fees in an amount to be determined by the Court after submission of the bill of costs. *See KKE Architects, Inc. v. Diamond Ridge Dev., LLC*, No. CV0706866MMMFMO, 2008 WL 11422047, at *3 (C.D. Cal. Apr. 21, 2008).

### F. ALC's Contract Claims as to MSN 37772

20. The Court concludes that Far Eastern is liable for the following claims as to MSN 37772: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) breach of implied-in-fact contract; and (4) common count for work, labor and services as to MSN 37772. The damages, however, are the same for these counts. In other words, the tortious claim for breach of the implicit duty of good faith and fair dealing does not give rise to different damages.

21. To prevail on a claim for breach of contract under California law, a plaintiff must show: "(1) the existence of a valid contract between the parties, (2) plaintiff's performance or excuse for nonperformance, (3) defendants' unjustified or unexcused failure to perform, and (4) damages to plaintiff caused by the breach." *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1188 (C.D. Cal. 2011) (citing *Lortz v. Connell*, 273 Cal. App. 2d 286, 290, 78 Cal. Rptr. 6 (1969)).

22.     Far Eastern did not perform its MSN 37772 lease obligations.  Far Eastern (1) did not pay two required $317,000 security deposits in breach of Sections 4.1 and 4.1.1 of the lease; (2) did not accept delivery of MSN 37772 in breach of Section 2.6 of the lease; and (3) failed to make any rent payments required by lease Sections 4.2 and 20.1.1.

23.     In its August 7 Order, the Court held that three of Far Eastern's alleged excuses for its non-performance fail as a matter of law: (1) that ALC did not perform its obligations under the MSN 37772 Lease; (2) that Far Eastern properly rescinded the lease under the terms of the agreement; and (3) that ALC waived its right to sue for breach of the agreement.  The only excuse the Court did not dismiss was Far Eastern's claim that it was excused from performing due to ALC's misrepresentation – negligent or intentional – of the condition of the aircraft.

24.     California courts require proof of the following elements for a party to prevail on a negligent misrepresentation claim: "[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage." *Shamsian v. Atl. Richfield Co.*, 107 Cal. App. 4th 967, 983, 132 Cal. Rptr. 2d 635 (2003).  The elements of fraudulent misrepresentation are the same, with the additional element of scienter.  *Dougherty v. Bank of Am., N.A.*, 177 F. Supp. 3d 1230, 1245 (E.D. Cal. 2015) (citing *Charnay v. Cobert*, 145 Cal. App. 4th 170, 184, 51 Cal. Rptr. 3d 471 (2006)).

25.     "[O]ne who learns that his statements, even if thought to be true when made, have become false through a change in circumstances, has the duty before his statements are acted on to disclose the new conditions to the party relying on his original representations." *Koch v. Williams*, 193 Cal. App. 2d 537, 541, 14 Cal. Rptr. 429 (1961) (plaintiffs defrauded in purchase of real property by defendants' failure to disclose that a drainage easement across the property had been granted by defendants to the city during escrow).  However, "this duty is clearly limited to pre-transaction occurrences." *Shamut*

*Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1487 (9th Cir. 1994) (no continuing disclosure duty after sale completed).

26.     "Common agency principles hold that knowledge of any agent of a corporation is imputed to the other agents of the corporation and to the principal." *Gilberd v. Dean Witter Reynolds, Inc.*, No. C 91-3254 TEH, 1992 WL 880089, at *4 (N.D. Cal. Aug. 11, 1992).  California Civil Code § 2332 provides that "as against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."  *Id.*

27.     To prove a negligent misrepresentation, Far Eastern had to prove: (1) that ALC represented to Far Eastern in July or August 2015 that MSN 37772 was "in operation;" (2) ALC knew that such representation later became false prior to lease signing; (3) ALC had a duty to correct the prior representation at that time; (4) ALC failed to correct the alleged representation with the intent that Far Eastern would rely on the prior truth of the representation; (5) the representation was regarding a material fact; (6) Far Eastern justifiably relied on the representation and ALC's failure to correct it; and (7) damages.

28.     The Court finds that ALC did make a representation that MSN 37772 was in operation.  Mr. Chen testified that, during negotiations for the LOI as to MSN 37772, Far Eastern may have asked whether the aircraft was flying, to which Mr. Chen testified that he responded in the affirmative.  The parties do not dispute that this representation was true when made, as MSN 37772 was not parked until November 2015.

29.     In the Court's August 7 Order, the Court identified the relevant question as "whether, ***prior to the signing of the MSN 37772 lease agreement***, ALC became aware that MSN 37772 had been inducted into storage."  (August 7 Order at 21 (emphasis in original)).

30.     The Court **FINDS** that ALC did not know, nor should it have known, that Air Berlin stored MSN 37772 prior to execution of the lease.

31.     Air Berlin had no obligation to inform ALC of the storage, and Air Berlin specifically stated in its Parking Notification Statement that it had not informed ALC of the storage.  Furthermore, that MSN 37772 flew only 34 hours in November, as evidenced by the utilization report received by ALC on December 3, 2015, was insufficient to put ALC on notice that MSN 37772 had been parked.  Low utilization can signify a number of things other than storage of the aircraft, such as regular maintenance or a drop in demand.  Furthermore, Mr. Burrati and Mr. Chang testified that their practice during the relevant time period when receiving these reports was not to look at them until there was a specific reason to do so, undermining a finding of actual knowledge.  However, even if Mr. Burrati or Mr. Chang had looked at the utilization report received on December 3, 2015, the 34 hours of flight time indicated in the report would not have necessarily put Mr. Burrati or Mr. Chang on notice that MSN 37772 was parked.  Ms. Kuo also testified that, even though the December 3 utilization report indicated that MSN 37772 had flown only 34 hours in November, low utilization is not cause for alert when the accounting department uses the utilization reports to calculate maintenance reserves.  Because ALC did not know, nor should it have known, that its representation later became false prior to execution of the lease agreement, ALC did not have a duty to correct.

32.     The Court **FINDS** that ALC's representation did not concern a material fact.

33.     "A misrepresentation is judged to be" material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 938 P.2d 903 (1997).  A matter is material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 333, 246 P.3d 877 (2011) (quoting Restatement (Second) of Torts § 538(2)(b)).

34.     The weight of the testimony at trial is that storage under an approved program does not impact airworthiness, maintenance condition, or value of an aircraft.

35.     Furthermore, the weight of the testimony at trial is that air carriers around the world routinely store aircraft.

36.     The weight of the testimony at trial is that any mistakes as to Air Berlin's storage of MSN 37772 were minor and inconsequential.

37.     Furthermore, during lease negotiations for MSN 37772, Far Eastern never mentioned storage.

38.     Prior to when the lease for MSN 37772 was signed, in April 2015, Far Eastern pursued six other B738 aircraft from UTAir that it knew were stored.

39.     Because the Court finds that ALC did not know, nor should it have known, that Air Berlin stored MSN 37772 prior to execution of the lease, Far Eastern's claim for negligent and fraudulent misrepresentation, violation of the UCL, and unjust enrichment claims likewise fail.

### G.     Far Eastern's Affirmative Defenses

40.     Far Eastern raises a plethora of affirmative defenses. A number of Far Eastern's defenses were addressed in the Court's August 7 Order, such as Far Eastern's defense for ratification and waiver. Furthermore, the Court need not address several of Far Eastern's other defenses; Far Eastern's affirmative defenses regarding excuse of performance, failure to disclose material information, and failure to mitigate, for example, are addressed above in the course of ruling on ALC's claims. The remainder of Far Eastern's affirmative defenses, such as unclean hands, fail because the Court **FINDS and CONCLUDES** that ALC did not become aware that MSN 37772 had been inducted into storage prior to the signing of the MSN 37772 Lease. Finally, to the extent Far Eastern's affirmative defenses are duplicative or coterminous with a counterclaim, for example, Far Eastern's affirmative defense for unjust enrichment and misrepresentation, the Court concludes the affirmative defenses rise or fall with the counterclaim.

### H.     ALC's Contract Damages for Breach of MSN 37772 Lease

41.     ALC is entitled to the following categories of damages: (1) the difference in value as between the Far Eastern and SpiceJet leases for MSN 37772; (2) the costs to re-

configure MSN 37772 to SpiceJet's specifications; (3) the costs to re-market MSN 37772; (4) pre-judgment interest; and (5) attorneys' fees.

42.     Items 3 through 5 were covered above with respect to MSN 41345, and the same analysis that applied to MSN 41345 applies here. ALC is therefore entitled to: (1) $37,100 in re-marketing costs for MSN 37772; (2) its reasonable attorneys' fees; and (3) pre-judgment simple interest from the date of the Complaint through the date of judgment at 10 percent *per annum*.

43.     ALC's damages are the difference in value between the value in the Far Eastern lease agreement and the SpiceJet lease agreement.

44.     The Far Eastern lease for MSN 37772 created a nominal value to ALC of $60.6 million. Pursuant to Section 20.6 of the MSN 37772 Lease, ALC's damages are to discounted to present value at a rate of 4%. $60.6 million discounted to present value at 4% is $50.0 million.

45.     The SpiceJet lease for MSN 37772 created a nominal value to ALC of $51.3 million. Pursuant to Section 20.6 of the MSN 37772 Lease, ALC's damages are to discounted to present value at a rate of 4%. $51.3 million discounted to present value at 4% is $43.3 million.

46.     Therefore, ALC's damages arising from the difference in value of the two MSN 37772 leases is $6.6 million on a discounted basis.

47.     ALC is entitled to the full amount set forth above, as the Court **FINDS and CONCLUDES** that ALC reasonably mitigated its damages. ALC moved to re-lease MSN 37772 as soon as possible after Far Eastern's breach; ALC sought to re-lease MSN 37772 on the best terms it could obtain; ALC re-leased MSN 37772 in an amount of time that was as good as or better than the industry standard for re-leasing an aircraft; and ALC obtained the best possible lease terms it was able to. Accordingly, no discount from the $6.6 million is merited.

## I.    **ALC's Transition Cost Damages for Breach of MSN 37772 Lease**

48.    ALC also is entitled to the cost to re-configure MSN 37772 from Far Eastern's desired specifications to those desired by SpiceJet because the re-configuration was required in order for ALC to re-lease the aircraft.

49.    These costs total $2.3 million.

50.    ALC expended $1.5 million to increase the thrust and maximum take-off weight in MSN 37772.  That improvement was not needed by SpiceJet, which operates approximately half of its fleet without that upgrade.  ALC could not recover that cost, and accordingly, it is recoverable from Far Eastern in full.

51.    ALC expended $500,000 to re-configure the interior of MSN 37772. Expending these re-configuration costs was a condition of re-leasing MSN 37772 to SpiceJet, without which ALC's damages would have been greater.  Accordingly, ALC is entitled to the full value of this expense.

52.    ALC expended an additional $300,000 in amounts necessary to undertake additional re-configurations for SpiceJet, including replacing placard cards, interior upgrades, and purchasing additional parts.  ALC has proven that the full value of these costs were incurred.  Expending these costs was a condition of re-leasing MSN 37772 to SpiceJet, without which ALC's damages would have been greater.

53.    The Court determines, however, that a $1 million discount is warranted from the total transition costs.  Pursuant to the early termination agreement for MSN 37772, Air Berlin paid a $1 million penalty to ALC to cover, in part, some of the cost to transfer the aircraft to the new lessee.

54.    Accordingly, the Court awards ALC $1.3 million in transition costs.

55.    ALC's total damages award is thus $23,374,200.

# <u>VERDICT</u>

The Court **FINDS** and **RULES** as follows:

1. On Plaintiffs' First Claim for breach of contract as to MSN 37772, the Court finds in favor of Plaintiffs.

2. On Plaintiffs' Second Claim for breach of the duty of good faith and fair dealing as to MSN 37772, the Court finds in favor of Plaintiffs.

3. On Plaintiffs' Third Claim for breach of implied in fact contract as to MSN 37772, the Court finds in favor of Plaintiffs.

4. On Plaintiffs' Fourth Claim for Work, Labor and Services as to MSN 37772, the Court finds in favor of Plaintiffs.

5. On Plaintiffs' Eighth Claim for Work, Labor and Services as to MSN 41345, the Court finds in favor of Plaintiffs.

6. On Defendant's First Claim for fraud and intentional misrepresentation as to MSN 37772, the Court finds in favor of Plaintiffs.

7. On Defendant's Second Claim for fraud and negligent misrepresentation as to MSN 37772, the Court finds in favor of Plaintiffs.

8. On Defendant's Fourth Claim for Unjust Enrichment as to MSN 37772, the Court finds in favor of Plaintiffs.

9. On Defendant's Fifth Claim for violation of California's Unfair Competition Law as to MSN 37772, the Court finds in favor of Plaintiffs.

10. ALC's total damages award is **$23,374,200**:

    a. $14.6 million for breach of the MSN 41345 Lease, which represents the difference in value between the Far Eastern and SpiceJet leases on a discounted basis.

    b. $800,000 in transition cost damages for breach of the MSN 41345 Lease.

    c. $37,100 in remarketing expenses for breach of the MSN 41345 Lease.

d. $6.6 million for breach of the MSN 37772 Lease, which represents the difference in value between the Far Eastern and SpiceJet leases on a discounted basis.

e. $1.3 million in transition cost damages for breach of the MSN 37772 Lease.

f. $37,100 in remarketing expenses for breach of the MSN 37772 Lease.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b) in this amount, plus awarding prejudgment interest and attorneys' fees and costs to be determined.

Dated:  May 22, 2019

MICHAEL W. FITZGERALD
United States District Judge